MARK POE (SB #223714)
  mpoe@gawpoe.com
RANDOLPH GAW (SB #223718)
  rgaw@gawpoe.com
SAMUEL SONG (SB #245007)
  ssong@gawpoe.com
VICTOR MENG (SB #254102)
  vmeng@gawpoe.com
GAW | POE LLP
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Telephone: (415) 766-7451
Facsimile: (415) 737-0642

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| E ONLINE GLOBAL, INC., SONORAN ONLINE MARKETING, LLC, and FOUR PEAKS ONLINE MARKETING, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE INC.<br><br>Defendant. | Case No. 3:16-cv-5822<br><br>**COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs eOnline Global, Inc., Sonoran Online Marketing, LLC, and Four Peaks Online Marketing, LLC (together, "Plaintiffs") allege as follows:

1.  This action is one of several similar actions brought against Google for its failure to honor its commitments to pay website publishers for the ad revenue that Google received from placing its ads on those companies' websites. This is the third case to be filed in federal court in

- 1 -  COMPLAINT

this district, and a similar case is currently pending in Santa Clara County Superior Court, captioned *Ogtanyan v. Google, Inc.*, Case No. 1-14-CV-259301.

2. As these cases allege, Google has improperly confiscated millions of dollars from the website owners (referred to in the online-advertising industry as "publishers") who have served up and delivered Google's online ads to billions of online consumers around the world. All of these cases seek to hold Google accountable for its breaches of contract, its breaches of the covenant of good faith and fair dealing, and its violations of the California Unfair Competition Law, Bus. & Prof. Code § 17200, et seq.

3. Among the several cases that have been filed concerning Google's AdSense practices, this one includes some special twists. First, multiple Google representatives at a Google-conducted AdSense seminar in Phoenix, Arizona reviewed examples of Plaintiffs' websites on Wednesday, October 17th, 2012. Rather than expressing *any* reservations about the websites' content, their compliance with the AdSense terms and conditions, or any other shortcoming, the Google personnel's *only* suggestion was on various ways that the owners of the websites could deploy ads to boost the number of views, and resulting revenue.

4. Second, neither Plaintiffs nor their owners were given any warning or notice of the supposed non-compliance with AdSense policies upon which the accounts were terminated. Instead, Plaintiffs' accounts were summarily terminated on July 12, 2016, on bases that (as will be seen) are completely unfounded and pretextual. Moreover, Plaintiffs' supposed "violations" do not actually violate any term of the AdSense Agreement, nor are they even arguable "invalid activity" that would bring them within the scope of the contract term that allows for earned funds to be confiscated. Nevertheless, Google retroactively seized and confiscated $396,350.86 in AdSense revenue that, as of July 11, 2016, had been earned by, and was owed to, Plaintiffs.

5. Third, the basis of the termination invoked by Google in this case makes its confiscation of Plaintiffs' already-earned funds particularly unfair and egregious. In some circumstances (such as click fraud, disguised or misplaced ads, or extremely low quality traffic), it arguably makes sense for Google to retroactively confiscate AdSense revenue. That is, where

COMPLAINT

the revenue has been generated by accidental clicks, or by clicks that are not from a real human viewing a real website, it is defensible for Google to argue, in essence, "well, you didn't actually earn that revenue, so we're not going to pay it." Here, in contrast, the claimed violation (which is false in the first place, as seen below) is that Plaintiffs' websites did not contain "unique and relevant content," and/or included "duplicate content." But that type of "violation"—even if it violated some contractual term—makes no difference to whether or not an actual human visited the website, and clicked on the ads, so that both Google and the advertiser received the entirety of the benefit that they had bargained with Plaintiffs to provide.

6. The vast majority of the traffic at Plaintiffs' websites was obtained from Bing and Yahoo, two sources of high-quality traffic. Whether or not Plaintiffs' websites were insufficiently "unique and relevant" in Google's determination—a "determination" that Plaintiffs look forward to reviewing in discovery—Plaintiffs' sites received legitimate, high quality, non-accidental, non-misled traffic, from which Google and its network of advertisers received the full-benefit, and an untold number of "clicks." Having received that benefit, it is unjust and unconscionable for Google to refuse to pay the agreed compensation to the entities that created that benefit.

## PARTIES

7. Plaintiffs eOnline Global, Inc., Sonoran Online Marketing, LLC, and Four Peaks Online Marketing, LLC are Arizona companies founded in 2007, 2010, and 2015, respectively.

8. The principal place of business for each Plaintiff is Arizona.

9. Defendant Google, Inc. ("Defendant" or "Google") is a corporation incorporated under the laws of the State of Delaware, having its principal place of business in Santa Clara County, California.

## JURISDICTIONAL STATEMENT

10. The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are all citizens of different states and the amount in controversy exceeds $75,000.

11. The Court has personal jurisdiction over Google because it transacts business in

California and because in the Google AdSense Online Terms of Service, it expressly consents to personal jurisdiction in this Court.

12.  Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Google resides and regularly conducts business in this district.

## INTRADISTRICT ASSIGNMENT

12.  Google's headquarters is located in Mountain View, California, and therefore assignment to the San Jose division of this Court is appropriate.

## FACTUAL BACKGROND

### *Google's AdSense Advertising Program*

13.  Google is the largest online marketing/advertising business in the world.  The AdWords Advertising Program ("AdWords") is Google's primary advertising program.  AdWords advertisements are displayed in a variety of formats such as text and/or images, alongside or above search results, on webpages, in emails, on blogs, and/or in videos.

14.  The Google AdSense Content program enables online publishers of websites to partner with Google to earn revenue from AdWords advertisements displayed on the publishers' websites. Google tracks each time Internet users click on advertisements displayed on AdSense publishers' websites, and charges advertisers for each click.  Google pays the AdSense publishers a portion of the amount paid by advertisers for the clicks, while retaining the remaining portion for itself.

15.  According to Google, publishers participating in the AdSense Content program are promised a 68% revenue share.  (https://support.google.com/adsense/answer/180195?hl=en). Furthermore, Google touts the superiority of its on-line advertising program against programs offered by competitors, as it stated "Another ad network might offer an 80% revenue share, but only collect $50 from advertisers, so you'd receive $40.  With the vast number of advertisers competing to appear on AdSense sites, our system ensures that you're earning the most possible for every ad impression you receive."

16.  The Google AdSense Online Terms of Service ("AdSense Agreement") governs

the relationship between website publishers and Google for the AdSense Content program. Google unilaterally drafts all contracts, policies, procedures, and guidelines governing the relationship between Google and AdSense publishers, as well as any and all amendments and modifications.

17. The AdSense Agreement provides the following policies and procedures for payments to publishers:

**Section 5: Payments**

Subject to this Section 5 and Section 10 of these AdSense Terms, you will receive a payment related to the number of valid clicks on Ads displayed on your Properties, the number of valid impressions of Ads displayed on your Properties, or other valid events performed in connection with the display of Ads on your Properties, in each case as determined by Google.

…

Payments will be calculated solely based on our accounting. Payments to you may be withheld to reflect or adjusted to exclude any amounts refunded or credited to advertisers and any amounts arising from invalid activity, as determined by Google in its sole discretion. Invalid activity is determined by Google in all cases and includes, but is not limited to, (i) spam, invalid queries, invalid impressions or invalid clicks on Ads generated by any person, bot, automated program or similar device, including through any clicks or impressions originating from your IP addresses or computers under your control; (ii) clicks solicited or impressions generated by payment of money, false representation, or requests for end users to click on Ads or take other actions; (iii) Ads served to end users whose browsers have JavaScript disabled; and (iv) clicks or impressions co-mingled with a significant amount of the activity described in (i, ii, and iii) above…

18. Further, the AdSense Agreement contains the following policies and procedures for termination or suspension of AdSense publisher accounts:

**Section 10: Termination**

You may terminate the Agreement at any time by completing the account cancellation process. The Agreement will be considered terminated within 10 business days of Google's receipt of your notice. If you terminate the Agreement and your earned balance equals or exceeds the applicable threshold, we will pay you your earned balance within approximately 90 days after the end of the calendar month in which the Agreement is terminated. Any earned balance below the applicable threshold will remain unpaid.

Google may at any time terminate the Agreement, or suspend or terminate the participation of any Property in the Services for any reason. If we terminate the Agreement due to your breach or due to invalid activity, we may withhold unpaid amounts or charge back your account…

19. Google is contractually obligated to act in good faith and deal fairly with AdSense publishers in implementing its prescribed policies and guidelines in the AdSense Agreement.

20. In particular, Google is obligated, pursuant to the terms of Section 5 of the AdSense Agreement, to act in good faith and deal fairly with AdWords publishers in: (a) determining the validity of clicks, impressions, and other activities/events performed in connection with the display of advertisements on the publishers' websites; (b) accounting for the payments owed to publishers under the AdSense Agreement; and (c) withholding payments arising from actual invalid activity.

21. Additionally, Google is obligated, pursuant to the terms of Section 10, to act in good faith and deal fairly with AdSense publishers in: (a) suspending or terminating the AdSense Agreement; (b) suspending or terminating the participation of any website in the AdSense program; (c) determining that an AdSense publisher breached the AdSense Agreement; (4) determining that an AdSense publisher engaged in invalid activity; and (5) withholding or charging back payments earned by an AdSense publisher under the AdSense Agreement.

### *Background on Plaintiffs*

22. The Plaintiff companies are owned by two Arizona residents, Travis Newman and Mark Ashworth. Both Mr. Newman and Mr. Ashworth have long backgrounds in the computer industry. Mr. Newman graduated from Arizona State University in 2000, with a Bachelor of Science in Computer Information Systems. From there, he went on to work as a computing and data consultant for some of the world's biggest companies, including IBM, Toshiba, and Hewlett-Packard, before going into business for himself. For his part, Mr. Ashworth graduated from Arizona State in 1993, received a Master of Science in Computer Science from Northern Arizona University in 1995, and similarly worked in consulting for major American companies, such as American Express and Saber Technologies. In 2007, Mr. Newman and Mr. Ashworth joined efforts in the online advertising and marketing space, founding Plaintiff eOnline Global, Inc.

23. Mr. Newman and Mr. Ashworth founded the other two plaintiff companies at the express recommendation of Google's Adsense team. This was because Google's AdSense

policies permit a maximum of 500 URL channels, which provide tracking for a specific URL inside of Google AdSense. To avoid that limitation, Mr. Ashworth and Mr. Newman created the other companies, so that additional URL channels could be associated with those companies. Each company was the account holder for a separate AdSense account.

*Plaintiffs' Online Advertising Business*

24. Plaintiffs operate a large portfolio of websites, which provide information on everything from credit advice, to cell phone recommendations, to career advice. Representative examples of Plaintiffs' websites are www.seniorcorps.org, www.todaysseniors.com www.dentalabout.com, and www.nursingguidance.com. As a review of these examples will show, Plaintiffs' websites all contain fulsome, carefully authored and curated content on the particular subject matter at issue.

25. Following formats prescribed by Google's AdSense policies, Plaintiffs' websites were accompanied by AdSense ads. When visitors to the sites would see an ad that caught their attention or interest, a certain small percentage of them would click on the ad, triggering a payment by that advertiser to Google. A percentage of that payment to Google was then deposited into Plaintiffs' AdSense account, because it was Plaintiffs who had "obtained" that traffic for Google, and in turn, for the advertiser.

26. As an example of this process, one can imagine a patient in a doctor's waiting room browsing the internet on his or her phone or tablet. Upon searching for, for example, "wedding ideas" in Bing, he might see a link to Plaintiffs' site www.weddingideas.us, and find a wealth of content on everything from "Flowers/Decorations," to "Planners & Coordinators." In turn, while reviewing the articles' content, that individual might see an AdSense ad touting a sale at DavidsBridal.com, and then click that ad to browse, and possibly buy, a pair of wedding shoes. The user's click on the David's Bridal ad would trigger a payment from David's Bridal to Google, which would in turn trigger a payment from Google into Plaintiffs' AdSense account.

27. As Google recommends to its AdSense publishers, Plaintiffs paid other websites (such as Bing and Yahoo—two known sources of high-quality traffic) to host links to Plaintiffs'

COMPLAINT

websites. Between 2014 and the present, Plaintiffs paid Bing and Yahoo alone over $1.6 million to help direct high-quality traffic to Plaintiffs' websites. More particularly, in the time period from June 1, 2016 to July 12, 2016—during which period Plaintiffs earned the $396,350.86 that Google confiscated—Plaintiffs had spent $233,183.79 on Bing ads, to generate that revenue.

28. Plaintiffs' various websites were a dramatic success, and showed steady growth in traffic. In proportion with that increased traffic (and the resulting increase in ad impressions and customer clicks), the amounts that Google owed to Plaintiffs under the parties' AdSense contracts grew from roughly $20,000 in monthly earnings in August 2014, to over $250,000 by June 2016. Also as described above, this growth in traffic and revenue was encouraged and fostered directly by Google. Indeed, as recently as 6-8 months ago, a Google AdSense representative phoned Mr. Ashworth, offering ideas for how to increase Plaintiffs' traffic and revenue even further.

***Google Confiscates Plaintiffs' Earnings—on a Basis Not Permitted By the Parties' Contract***

29. By mid-July 2016, Plaintiffs had accrued $396,350.86 in their AdSense accounts. Abruptly, on July 12, without having received any prior warning from Google or any account representative, Plaintiffs were informed by email that Google had disabled all three of their AdSense accounts, and would not pay out Plaintiffs' earnings that had accrued in those accounts.

30. Google's July 12 email provided a hodgepodge of generalizations and alternative explanations for why the accounts were terminated, or rather, various reasons upon which the accounts "may" have been terminated. The email read:

> It's important for a site displaying AdSense to offer significant value to the user by providing unique and relevant content, and not to place ads on auto-generated pages or pages with little to no original content. This may include, but is not limited to:
>
> - copying portions of text content from other sources
>
> - websites dedicated to embedded videos from other hosts
>
> - websites with gibberish content that makes no sense or seems auto-generated
>
> - templated or pre-generated websites that provide duplicate content to users.

COMPLAINT

31. Not one of these "violations" applies to Plaintiffs' websites. The content on Plaintiffs' websites is all original. Plaintiffs hire professional article writers to create the information and advice on their websites, and to ensure that those writers are not copying someone else's work, all of the material is run through Copyscape (www.copyscape.com), the world's best-known software for detecting duplicated material, and which, ironically, Google itself contracts with as Copyscape's search provider. *See* http://www.copyscape.com/faqs.php#providers. Nor were Plaintiffs' websites "dedicated to embedded videos," "gibberish content," nor were they "pre-generated websites that provide duplicate content."

32. Even more importantly though, by the terms of Google's own AdSense agreement, the bulleted "violations" it invoked as the basis for terminating Plaintiffs' accounts are not grounds upon which Google is entitled to confiscate revenue that has been earned. That is, Section 5 of the Agreement states that payments may be "withheld to reflect" or "adjusted to exclude" amounts "arising from invalid activity." It proceeds to give examples of that "invalid activity," all of which stem from, as the term implies, *invalid* activity:

> Payments to you may be withheld to reflect or adjusted to exclude any amounts refunded or credited to advertisers and any amounts arising from invalid activity, as determined by Google in its sole discretion. Invalid activity is determined by Google in all cases and includes, but is not limited to, (i) spam, invalid queries, invalid impressions or invalid clicks on Ads generated by any person, bot, automated program or similar device, including through any clicks or impressions originating from your IP addresses or computers under your control; (ii) clicks solicited or impressions generated by payment of money, false representation, or requests for end users to click on Ads or take other actions; (iii) Ads served to end users whose browsers have JavaScript disabled; and (iv) clicks or impressions co-mingled with a significant amount of the activity described in (i, ii, and iii) above.

33. In the other lawsuits in this AdSense genre, Google has invoked the "sole discretion" term in the first sentence quoted above as authority to terminate accounts and confiscate funds. But that is no help here, because by the plain words of the Agreement, that "sole discretion" is exercised only with respect to "invalid activity": "Payments to you may be withheld to reflect or adjusted to exclude any amounts refunded or credited to advertisers and any amounts *arising from invalid activity*, *as determined by Google in its sole discretion*." Because

the basis for Plaintiffs' termination and confiscation is not any form of "invalid activity," the "sole discretion" term is inapplicable to the confiscation at issue here, and to Plaintiffs' claim more broadly.

34. After listing the four "violations" that are not actually violations of the AdSense Agreement, Google's termination email advised, "For more information, please review the <u>AdSense program policies</u>, this <u>help article about scraped content</u> and Google's <u>Webmaster Quality Guidelines</u>," with hyperlinks to each of those sources. But none of those links identifies the four bulleted "violations" as "violations" either, and even if they did, they are of no significance to this claim, because the AdSense Agreement includes a merger clause reading, in part: "The Agreement is our entire agreement relating to your use of the Services and supersedes any prior or contemporaneous agreements on that subject."

35. The termination email thereafter confirmed that a publisher's earnings can only be confiscated for breach of the AdSense Agreement: "As stated in the AdSense Terms and Conditions (https://www.google.com/adsense/localized-terms), Google reserves the right to withhold payments from publishers **due to any breach** of the program agreement." As set forth above, there was no breach of the Agreement.

36. Plaintiffs promptly appealed Google's illegal action, filing an appeal (an appeal which is limited by Google's on-line form to no more than 1,000 *characters*; not words—characters. With those limited characters, Plaintiffs explained that they "would like to address each reason with a response and humbly request re-inclusion," and proceeded to explain that none of the bulleted "violations" was correct for their websites. They closed their appeal by requesting, "Please help us to correct any possible policy violations we have not addressed."

37. On information and belief, Google never (1) responded to Plaintiffs' appeal, (2) tasked anyone with double-checking the accuracy of the bulleted "violations," or (3) considered whether the proffered "violations" were "invalid activity" which would permit the confiscation of Plaintiffs' earnings.

**CAUSES OF ACTION**

## PLAINTIFF'S FIRST CAUSE OF ACTION
**(Breach of Contract)**

38. Plaintiff realleges and incorporates the paragraphs of this Complaint as if set forth herein.

39. Plaintiff entered into the AdSense Agreement with Defendant Google to participate in the AdSense publisher's program. Plaintiff performed all of its obligations under the AdSense Agreement.

40. In breach of the AdSense Agreement, Google: (1) confiscated the earnings that had accrued as of July 12, 2016, despite the facts that (a) Plaintiffs had not breached any term of the Agreement, nor (b) engaged or benefitted from any "invalid activity," and (2) terminated the AdSense Agreement with Plaintiffs for no reason, in violation of Section 10 of the Agreement.

41. As a direct and proximate result of Google's breach of contract as set forth above, Plaintiff has been damaged in an amount to be proven at trial of no less than $396,350.86.

42. In addition, Google's breach of contract damaged Plaintiffs because they lost future profits as a result. The increased number of viewers to Plaintiffs' websites would have resulted in substantially higher AdSense earnings in the months to come. And, had Plaintiffs received their payments as Google was contractually obligated to pay, they would have re-invested those earnings into driving even more user traffic to their websites, and would be earning even more monthly advertising revenue.

43. Google was fully aware that its breach of contract could result in lost future profits for Plaintiffs. Google encourages its publishers to acquire additional user traffic by using advertising or partnering with traffic sites. Such efforts obviously come at a financial cost to the publisher and cannot be sustained if Google does not pay out the earnings derived from such investment of funds by the publisher.

## PLAINTIFF'S SECOND CAUSE OF ACTION
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

44. Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if fully set forth herein.

45. Google has a duty under California law to act in good faith and deal fairly with Plaintiffs in connection with the parties' AdSense Agreement and its obligations in administering the AdSense advertising program.

46. Google breached its duty of good faith and fair dealing by arbitrarily and capriciously terminating Plaintiffs' AdSense accounts for no reason. It further breached that duty by confiscating all of Plaintiffs' accrued AdSense earnings, on a basis that is not permitted under the terms of the Agreement.

47. By not giving Plaintiffs fair notice of what AdSense policies they had supposedly violated, Plaintiffs did not receive a meaningful opportunity to contest the validity of those violations.

48. Google breached its duty of good faith and fair dealing by refusing to provide a meaningful review of Plaintiffs' internal appeal to Google over their purported AdSense policy violations. Forcing Plaintiffs to limit their appeal to 1,000 characters is *per se* unreasonable. Assuming four letters per word plus a space, Plaintiffs had no more than 200 words with which to defend and/or explain their practices—even assuming that Google's vague termination reason had given them sufficient notice of *what* they needed to explain. On information and belief, no human actually reviewed and adjudicated the appeal Plaintiffs filed associated with their account terminations.

49. Google breached its duty of good faith and fair dealing because it withheld all of Plaintiffs' accrued AdSense earnings from all of their websites even though—even if any of the bulleted violations was true—it would apply only to a tiny number of those websites.

50. As a proximate result of Google's breach of duty, Plaintiffs have personally been damaged in an amount no less than $396,350.86.

51. In addition, Google's breach of contract damaged Plaintiffs because they lost future profits as a result. The increased number of viewers to Plaintiffs' websites would have resulted in substantially higher AdSense earnings in the months to come. And, had Plaintiffs received their earnouts as Google was contractually obligated to pay, they would have re-invested

those earnings into driving even more user traffic to their websites and would be earning even more monthly advertising revenue.

52. Google was fully aware that its breach of duty could result in lost future profits for Plaintiffs. Google encourages its publishers to acquire additional user traffic by using advertising or partnering with traffic sites. Such efforts obviously come at a financial cost to the publisher and cannot be sustained if Google does not pay out the earnings derived from such investment of funds by the publisher.

**THIRD CAUSE OF ACTION**
**(Quasi-Contract / Unjust Enrichment)**

53. Plaintiffs hereby reincorporate and re-allege all the preceding paragraphs as if fully set forth herein.

54. Google induced Plaintiffs to provide valuable services to Google in exchange for the promise of payment of their accrued AdSense earnings.

55. Even if Google had, in fact, refunded to its advertisers all the amounts they paid to Google for Plaintiffs' displaying of AdSense advertisements on their behalf, Google still greatly benefited at Plaintiffs' expense. When Google confiscates the funds from the publisher, and credits them back to the advertiser, it effectively (and substantially) lowers that advertiser's cost of advertising, **at the publisher's, not Google's** expense. That is, the advertiser still received the click from the person who was browsing the publisher's site, but did not have to pay for it. Through this process, Google earns substantial goodwill from its advertiser customer base, and obtains a competitive advantage vis-à-vis its competitors in the online advertising business who do not confiscate their publishers' accrued earnings and kick them back to the advertiser.

56. In other words, it is as if Google had provided a "buy one click, get one click free" promotion to its advertisers except that AdSense publishers like Plaintiffs are the ones subsidizing the "free click" for those publishers.

57. Google's retention of these benefits for itself, while providing nothing to Plaintiffs, is unjust. The value obtained by Google is at least $396,350.86.

**FOURTH CAUSE OF ACTION**

**(Quantum Meruit)**

58. Plaintiffs hereby reincorporate and re-allege all the preceding paragraphs as if fully set forth herein.

59. Plaintiffs were induced to perform services for Google.

60. Google failed to pay Plaintiffs their accrued AdSense earnings, yet accepted the valuable benefits of Plaintiffs' services to Google.

61. Plaintiffs are entitled to the reasonable value of their services provided to Google.

**FIFTH CAUSE OF ACTION**
**(Declaratory Relief)**

62. Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if fully set forth herein.

63. Google's AdSense Terms of Service include a Limitation of Liability provision that exempts Google from any "consequential, special, indirect, exemplary, or punitive damages whether in contract, tort or any other theory." The Limitation of Liability also states that liability is "limited to the net amount received and retained by that particular party in connection with this Agreement."

64. Google has invoked this Limitation of Liability in other lawsuits brought by other AdSense publishers to argue that it owes no liability to those AdSense publishers. It is expected that Google will invoke that provision in this lawsuit as well.

65. Plaintiffs seek a declaration that this Limitation of Liability is substantively and procedurally unconscionable and therefore unenforceable under principles of California contract law.

66. The Limitation of Liability is substantively unconscionable because it is transparently one-sided in favor of Google. There are virtually no instances in which an AdSense publisher could engage in conduct that could cause "consequential, special, indirect, exemplary or punitive" damages to Google. These terms therefore operate only for Google's benefit and to the detriment of AdSense publishers.

67. The Limitation of Liability is procedurally unconscionable for many reasons, not

least of which it is presented as a take-it-or-leave it provision to AdSense publishers.  And given that Google's AdSense program has a virtual monopoly in the field of on-line advertising, anyone who wishes to monetize their websites through advertising has to use AdSense.

## **PRAYER**

**WHEREFORE**, Plaintiffs pray for judgment as follows:

1. For judgment against defendant Google Inc.;
2. For compensatory and special damages;
3. For declaratory relief;
4. For restitution;
5. For pre-judgment interest;
6. For costs; and
7. For such other and further relief as the Court deems just and proper.

Dated:  October 7, 2016                    GAW | POE LLP

By: /s/ Mark Poe
Mark Poe
Attorneys for Plaintiffs

## JURY DEMAND

Plaintiffs hereby demand a jury trial for their claims against defendant Google Inc.

Dated:  October 7, 2016         GAW | POE LLP

                                By: _____
                                    Mark Poe
                                    Attorneys for Plaintiff