# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN JOSE DIVISION

| | |
|---|---|
| EONLINE GLOBAL, INC, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No. 5:16-cv-05822-EJD<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 72, 82-3 |

This matter is a dispute over a contract for online advertising. Defendant Google LLC connects companies that seek to advertise their goods or services with the publishers of webpages that wish to make a profit by placing ads on their webpages. Plaintiffs eOnline Global, Inc., Sonoran Online Marketing, LLC, and Four Peaks Online Marketing, LLC (collectively "Plaintiffs") are website publishers that have brought suit against Google for breach of contract, breach of the implied covenant of good faith and fair dealing, and for declaratory relief. Their claims arise from Google's termination of their advertising accounts and withholding of more than $400,000 in unpaid funds. Google has moved for summary judgment as to all three of Plaintiffs' causes of action. Plaintiffs cross-moved for summary judgment. The Court has considered the parties' papers and listened to their oral argument. For the reasons stated below, the Court grants Google's motion and denies Plaintiffs' cross motion.

**I. Background**

Google runs an advertising program called AdSense where it acts as the go-between for advertisers and publishers. Ex. 20, Liu Decl. ¶ 3. Through AdSense, Google provides publishers,

Case No.: 5:16-cv-05822-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT; DENYING CROSS MOTION FOR SUMMARY JUDGMENT

1

such as Plaintiffs, with bits of code to post on their webpages. Liu Decl. ¶ 3. Google's algorithms determine which ads to feature on which websites, and that bit of code displays the ads. *Id.* ¶ 4. In the version of the program of which Plaintiffs were a part, every time a visitor to their websites clicked on an ad, Google charged the advertiser and paid 68 percent of the charge to Plaintiffs while retaining 32 percent for itself. *Id.* ¶ 6. Google uses various tools to attempt to ensure that it only charges advertisers for "valid" clicks—that is clicks from real users with real interest in the advertisers' goods and services. *Id.* In theory, the publishers attract website visitors who would be genuinely interested in the ads, and in turn they receive payment when their visitors click the ads. *Id.* ¶¶ 6, 24. Advertisers, meanwhile, can display their ads to potential customers that have genuine interest in their goods and services. *Id.* Google pays publishers at the end of the calendar month following any month when the publishers earned a balance. Ex. 9 at 514.

Plaintiffs are three website publishing companies founded, owned, and run by Mark Ashworth and Travis Newman. Ex. 3 at 19:19-20:3; Ex. 4 at 38:18-39:16. Because Google limits each AdSense account to 500 URLs, Ashworth and Newman—following advice from a Google employee's online forum posting—created and used three separate companies to increase the number of URLs that could they use with AdSense. Ex. B at 16:12-20. Ashworth and Newman controlled the three companies and ran their business the same way across them. Ex. 4 at 20:14-23:6. Most of the content for their websites was created by a third-party vendor called Textbroker, which writes discrete articles. *See* Ex. 43. Plaintiffs also hired three "writer managers," including an individual named Mindi Fishman, to manage the creation of the content and, sometimes, to write articles themselves. Ex. 3 at 20:14-20; Ex. 5 at 30:9-12, 36:15-21, 39:9-14.

As participants in AdSense, Plaintiffs agreed to the Google AdSense Online Terms of Service ("the TOS"). Ex. 9. The TOS expressly incorporate another document called the AdSense Program Policies (ex. 10 ("the Program Policies")) (collectively "the Agreement"). Ex. 9 at 1. Plaintiffs do not dispute that these two documents constitute the contract at issue and that they are bound by their terms. The Agreement lays out how publishers will be paid, sets standards

and requirements for webpages and content, allows either party to terminate the Agreement for any reason, and includes a Limitation of Liability provision that limits the liability of both parties to "THE NET AMOUNT RECEIVED AND RETAINED BY THAT PARTICULAR PARTY . . . DURING THE THREE MONTH PERIOD IMMEDIATELY PRECEDING THE DAY OF THE CLAIM." Ex. 9; Ex. 10. The Agreement also allows Google to withhold payment if it "terminate[s] the Agreement due to [a publisher's] breach or due to invalid activity." Ex. 9 at 516.

Plaintiff companies signed up for AdSense in 2008, 2010, and 2015. Liu Decl. ¶¶ 10-11. They earned money through the program until the weeks preceding Google's termination of their accounts. *Id.* Google linked the accounts for each Plaintiff in their internal systems so that they were evaluated together. *See id.* ¶ 37. In early 2016, Google began sending Plaintiffs warnings that their ad placement on mobile sites violated Google's standards. Liu Decl. ¶¶ 68-69. Google sent more than a dozen warnings to Plaintiffs. *Id.* ¶ 67. Google terminated each Plaintiff company's account on July 12, 2016. *Id.* ¶ 70. The termination notice states: "This email is to alert you that your AdSense account was found to be non-compliant with our AdSense program policies and as a result, your **AdSense account has been disabled**. . . . **Violation explanation** . . . It's important for a site displaying AdSense to offer significant value to the user by providing unique and relevant content, and not to place ads on auto-generated pages or pages with little to no original content." Ex. 35 (emphasis in the original). Plaintiffs filed an internal appeal, but Google denied it on September 26, 2016. Liu Decl. ¶¶ 72-73.

At the time of the termination, Plaintiffs had $404,433.44 in unpaid amounts in their three accounts. Kher. Decl. ¶ 7. Google credited this money, plus its share of the revenue from the ads on Plaintiffs' websites and an additional $221,000, back to the advertisers who had been charged for the ads running on Plaintiffs' websites. Kher Decl ¶¶ 6-11; Ex. 38; Ex. 39.

II. **Legal Standard**

Summary judgment is appropriate where the moving party shows that no genuine dispute as to any material fact exists and that it is entitled to judgment as a matter of law. Fed. R. Civ. P.

Case No.: 5:16-cv-05822-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT; DENYING CROSS MOTION FOR SUMMARY JUDGMENT

3

56(a). A dispute is "genuine" if there is sufficient evidence that a reasonable fact finder could find for the nonmoving party. *Groupion, LLC v. Groupon, Inc*., 859 F. Supp. 2d 1067, 1072 (N.D. Cal. 2012) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-49 (1986)). A fact is "material" if it could change the outcome of the case. *Id.* The Court must read the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).

If the moving party will not bear the ultimate burden of persuasion at trial, like Google on its motion, then it must carry both the burden of production and the burden of persuasion on its motion for summary judgment. *Friedman v. Live Nation Merch., Inc*., 833 F.3d 1180, 1188 (9th Cir. 2016) (citing *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc*., 210 F.3d 1099, 1102 (9th Cir. 2000)). To carry the burden of production, the moving party "must either produce evidence negating an essential element of the nonmoving party's claim . . . or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine*, 210 F.3d at 1102-03. To successfully carry the burden of persuasion, the moving party must show the court that no genuine dispute of material fact exists. *Id.* at 1102. If the moving party does not carry its initial burden of production, then the nonmoving party need not produce any evidence to defeat the motion. *Id.* at 1103. But, if the moving party does carry the burden of production, then the nonmoving party must identify with reasonable particularity enough evidence supporting its claim or defense to create a genuine dispute of material fact to defeat the motion. *Id.*; *Groupion*, 859 F. Supp. 2d at 1072 (citing *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996)). Otherwise, the moving party will win on its motion. *Nissan Fire & Marine*, 210 F.3d at 1103.

For motions where the moving party will bear the ultimate burden of proof at trial, such as with Plaintiffs' cross motion here, the analysis is slightly different. The moving party "must prove each element essential of the claims upon which it seeks judgment by undisputed facts" in order to succeed. *First Pac. Networks, Inc. v. Atl. Mut. Ins. Co*., 891 F. Supp. 510, 513 (N.D. Cal. 1995).

This showing "must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *t'Bear v. Forman*, 359 F. Supp. 3d 882, 905 (N.D. Cal. 2019) (quoting *Atl. Mut. Ins. Co.*, 891 F. Supp. 3d at 513). Only then must the nonmoving party "present significant probative evidence tending to support its claim or defense" to defeat the motion. *C.A.R. Transp. Brokerage Co. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000).

For both sorts of motions, the evidence presented by the nonmoving party must be must be enough for a jury to return a verdict for the nonmoving party. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). If the nonmoving party's "evidence is merely colorable or is not significantly probative," then summary judgment may be granted. *Jay v. Serv. Employees Int'l Union-United Health Care Workers W.*, 2017 WL 3670781, at *3 (N.D. Cal. Aug. 25, 2017) (citing *McIndoe v. Huntington Ingalls Inc.,* 817 F.3d 1170, 1173 (9th Cir. 2016)).

For Google to prevail on its motion, it must either produce evidence negating an essential element of Plaintiffs' claims or show that Plaintiffs cannot produce sufficient evidence to carry the burden of proof at trial for an essential element of its claims. If Google makes that initial showing, Plaintiffs can still defeat Google's motion by producing evidence that creates a genuine issue of material fact. For Plaintiffs to prevail on the their cross motion, they present evidence showing that no reasonable fact finder could find for Google as to each element of their claims. If Plaintiffs make that showing, Google can defeat the motion by presenting evidence that creates a genuine issue of material fact as to at least one element of the claims.

Plaintiffs, though, present the legal analysis differently. They assert: "the only relevant questions are (1) whether Plaintiffs 'breach[ed]' 'the Agreement' such that confiscation [of the unpaid funds] was permissible, and (2) whether Google decided to terminate Plaintiffs 'due to' that supposed breach." Cross Mot. at 1. This formulation erroneously omits any burden they may bear as to each element of their claims.

**III. Google's Motion for Summary Judgment**

**A. Breach of Contract**

Plaintiffs contend that Google breached the Agreement by retaining the unpaid funds when Plaintiffs' termination was not "due to" any breach of the Agreement by Plaintiffs. ECF No. 43, Am. Compl. ¶¶ 39-40; Cross Mot. at 10-18. The elements of a claim for breach of contract are: "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011) (citation omitted). While Google first argues that it did not breach the Agreement, the Court first considers Google's second argument that Plaintiffs cannot show that they performed under the Agreement—the second element. Google presents sufficient evidence to carry their initial burden of production "negating" this element. *See Nissan Fire & Marine*, 210 F.3d at 1102-03. Plaintiffs make no attempt to present their own evidence that would create a genuine dispute of material fact as to that element, and their arguments—to the extent their briefing even addresses their performance—are not persuasive.

**1. Legal Framework**

The parties do not dispute that the Agreement is governed by California law. Ex. 9 at 517. "A bedrock principle of California contract law is that '[h]e who seeks to enforce a contract must show that he has complied with the conditions and agreements of the contract on his part to be performed.'" *Brown v. Dillard's, Inc.*, 430 F.3d 1004, 1010 (9th Cir. 2005) (quoting *Pry Corp. of Am. v. Leach*, 177 Cal. App. 2d 632, 639 (1960)); *see also Oracle Am., Inc. v. Innovative Tech. Distributors LLC*, 2012 WL 4122813, at *20 (N.D. Cal. Sept. 18, 2012) ("It is axiomatic that a plaintiff who has himself materially breached or failed to perform a contract may not pursue a breach of contract action against the other party to the agreement."); *Wiz Tech., Inc. v. Coopers & Lybrand*, 106 Cal. App. 4th 1, 12 (2003), *as modified* (Feb. 6, 2003) ("A party complaining of the breach of a contract is not entitled to recover therefor unless he has fulfilled his obligations." (citation and quotation omitted)); *Consol. World Investments, Inc. v. Lido Preferred Ltd.*, 9 Cal.

App. 4th 373, 380 (1992) ("It is elementary a plaintiff suing for breach of contract must prove it has performed all conditions on its part or that it was excused from performance.").

The nonperformance or breach by a plaintiff must be material to preclude the claim for breach of contract. *Brown v. Grimes*, 192 Cal. App. 4th 265, 277 (2011); *see also Hitz Entm't Corp. v. Mosley*, 2018 WL 2722512, at *4 (C.D. Cal. Apr. 10, 2018) ("To excuse performance by one party to a contract, the breach by the other party must be material." (citation and quoting omitted)); *Signal Hill Serv., Inc. v. Macquarie Bank Ltd.*, 2011 WL 13220305, at *14 (C.D. Cal. June 29, 2011) ("The plaintiff must be free from substantial default in order to avail himself of the remedies for the defendant's breach."). Whether a breach or failure to preform is material is generally a question of fact, but "if reasonable minds cannot differ on the issue of materiality, the issue may be resolved as a matter of law." *Hitz Entm't*, 2018 WL 2722512, at *4 (quoting *Brown*, 192 Cal. App. 4th at 278 (citing *Insurance Underwriters Clearing House, Inc. v. Natomas Co.*, 184 Cal. App. 3d 1520, 1526-1527 (1986)). Breach or nonperformance is material when it "frustrate[s] the purpose of the contract." *Superior Motels, Inc. v. Rinn Motor Hotels, Inc.*, 195 Cal. App. 3d 1032, 1051 (Ct. App. 1987) (citation omitted).

When there is no genuine dispute of material fact that the complaining party failed to perform, summary judgment is appropriate. *Oracle*, 2012 WL 4122813, at *20 (granting summary judgment where "ITD . . . failed to pay Oracle for millions of dollars in product which it purchased under the parties' greement. . . . Accordingly, ITD cannot pursue a breach of contract claim against Oracle . . . ."); *see also Pena v. GMAC Mortg., LLC*, 2010 WL 11519504, at *7 (C.D. Cal. Sept. 13, 2010).

### 2. **Plaintiffs Failed to Perform Under the Agreement**

While Google presents evidence that Plaintiffs breached or failed to perform the Agreement in several ways, the Court focuses on just two that are both material and without dispute. First, Google has shown that Plaintiffs breached the Agreement by creating websites specifically for running ads. The Program Policies prohibit this practice: "Google ads . . . may not

Case No.: 5:16-cv-05822-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT; DENYING CROSS MOTION FOR SUMMARY JUDGMENT
7

be . . . [p]laced on pages published specifically for the purpose of showing ads." Ex. 10 at 004. The undisputed facts establish that Plaintiffs did just that. Ashworth testified that Plaintiffs would select the subject matter of their webpages by "looking at the verticals and figuring out which we felt would make the most money." Ex. 4 at 53:9-11; ECF No. 87-1 at 3 (Fact 13). Their two biggest factors for choosing the website subject matters were the level of expected visitor traffic and expected amount they would make per ad-click. Ex. 4 at 64:10-65:11. In one instance, Newman and Ashworth planned to publish a website with content purporting to discuss free website hosting services with topics such as "Free Websites" and "Free Servers," and then run ads that did not offer free services. Ex. 55 at 604. Newman explained in an email, "[t]he ads that will run won't offer free, but our visitor won't know that :) There should be a decent amount of traffic in this space too." *Id.* Having selected profitable subject matters, Plaintiffs would then identify keyword phrases, such as "bad credit loans" or "medicare supplemental insurance," to draw high-paying advertisements. Ex. 43 at -570; Ex. 44 at -504; ECF No. 87-1 at 3 (Fact 14). Plaintiffs used the keyword phrases to write the titles for articles before writing the articles themselves. Ex. 5 at 137:2-17; Ex. 43 at 573; ECF No. 87-1 at 3 (Fact 14). Plaintiffs sometimes produced up to 100 titles for yet-to-be-written articles based on a single keyword phrase. Ex. 43 at 570; Ex. 44 at 504; ECF No. 87-1 at 3 (Fact 14). Plaintiffs would then provide the titles to Textbroker, who wrote the actual text of the articles. Ex. 43 at 574; ECF No. 87-1 at 3-4 (Facts 12, 15-16). Plaintiffs would instruct Textbroker to use each keyword phrase at least three times per article. *Id.* Plaintiffs paid about $5.00 per article. *See* Ex. 46. Plaintiffs "manage[d] which articles g[o]t written for which sites using which keywords." Ex. 43 at 682.

With Plaintiffs focused on churning out content specifically to draw high paying ads and large numbers of website visitors, the published content was frequently duplicative and/or lacking substance or value. For example, on their website NoCreditUSA, eight of the 18 webpages addressed how to obtain a credit card despite having a bad credit rating. *See* Ex. 19; ECF No. 87-1 at 6 (Fact 23). Plaintiffs made essentially no effort to ensure their websites offered content of

substance or value. Fishman would skim the articles to make sure that followed "English 101," but she did not review for them for quality or accuracy. *See* Ex. 5 at 126:15-127:17; 158:10-25; ECF No. 87-1 at 4-5 (Fact 19). One of their websites purported to provide information on "How to Get Instant Approval Credit Cards With Bad Credit," but the website included no instructions or directions for obtaining instant approval. *See* Ex. 26; ECF No. 87-1 at 5-6 (Fact 22). But Fishman would make sure to check that each article repeated the keyword phrases several times. Ex. 43 at 574; ECF No. 87-1 at 4-5 (Fact 19). The visitors to Plaintiffs' websites noticed and submitted complaints that the websites contained inaccurate and/or conflicting information. Ex. 48; Ex. 49; ECF No. 87-1 at 5 (Fact 21). These facts show Plaintiffs engaged in a deliberate process to publish websites specifically to run high-paying ads—a violation of the Program Policies.

Second, Plaintiffs do not dispute that that their websites were intentionally deceptive. The Program Policies prohibit publishers from "us[ing] deceptive implementation methods to obtain clicks." Ex. 10 at 001. Plaintiffs though published websites where Fishman and Textbroker created and uploaded content that appeared to be posts from multiple flesh-and-blood visitors discussing the subject matter of the website. ECF No. 87-1 at 7-8 (Fact 28). For example, for their website "AutoInsuranceSelect," which ran Google's ads, Ashworth sent Fishman an email instructing her to "login as a [*sic*] different people. We will provide you with 5 login names to distribute the articles evenly with. . . . [U]pload 2 articles each for each login that we provide." Ex. 50 at 951; ECF No. 87-1 at 7-8 (Fact 28). The email exchange shows Plaintiffs' unambiguous plan to deceive visitors into believing that their websites had an active community of legitimate visitors when they did not. Google has carried the burden of production to show that Plaintiffs did not perform under or breached these two provisions of the Agreement.

### 3. Plaintiffs Failures to Perform Was Material

Google must also show that Plaintiffs' failure to perform was material in order to negate the second element of Plaintiffs breach of contract claim. Here, "reasonable minds cannot differ"

Case No.: 5:16-cv-05822-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT; DENYING CROSS MOTION FOR SUMMARY JUDGMENT

9

as to whether Plaintiffs' nonperformance was material. *See Hitz Entm't*, 2018 WL 2722512, at *4. By creating websites specifically to run ads and by filling those websites with intentionally deceptive content, Plaintiffs have "frustrated the purpose" of the Agreement. *See Superior Motels*, 195 Cal. App. 3d at 1051. These breaches and nonperformance of the Agreement happened across the pages that generated the majority of Plaintiffs' earnings in the six weeks prior to their termination. Liu Decl. ¶¶ 50, 64-66. The NoCreditUSA website, by itself, generated over 44 percent of their earnings during that time period. *Id.* ¶ 66. Google has therefore presented sufficient evidence to carry its initial burden of production to negate the second element of Plaintiffs' breach of contract claim.

### 4. Plaintiffs' Arguments

To the extent Plaintiffs even attempt to rebut Google's argument regarding this element, their arguments are unpersuasive. The Court notes, as an initial matter, that Plaintiffs neither present their own evidence nor dispute any of the facts discussed above. Instead, Plaintiffs make four other arguments to support their claim for breach of contract. First, they argue that they did not commit the specific breaches Google identified in the termination notice and in its internal documentation. Cross Mot. at 10-15. But this argument addresses whether Google breached the Agreement by withholding the unpaid funds without justification. It does not show that Plaintiffs otherwise performed their obligations. Second, they argue that "most" of the alleged breaches identified by Google are found in documents other than the TOS or Program Policies, so Plaintiffs were not bound by those documents. Cross Mot. at 15-17. The Court need not consider this argument because the Court finds that Plaintiffs breached the Program Policies, which Plaintiffs concede were binding on them as part of "the Agreement." Cross Mot. at 1-2, 3-4, 16. Third, to the extent that Google identifies provisions of the Agreement that Plaintiffs breached, Plaintiffs discount those breaches because for lacking any "causal tie" to the provision of the TOS that would allow Google to withhold any unpaid funds. Cross Mot. at 17-18. This argument fails for the same reason the first argument failed; Plaintiffs must show that they performed independently

Case No.: 5:16-cv-05822-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT; DENYING CROSS MOTION FOR SUMMARY JUDGMENT

of Google's alleged breach.  And finally, Plaintiffs assert that this matter concerns a number of genuine factual disputes that only a jury can decide.  Cross Mot. at 18-19.  But Plaintiffs do not dispute any of the facts showing that they breached the two provisions of the Program Policies discussed above.  Given the plain language of the Agreement, and the undisputed facts of Plaintiffs' conduct, no reasonable jury could conclude that Plaintiffs performed under the Agreement.  Accordingly, the Court grants Google's motion on the breach of contract claim.  The Court does not reach Google's argument that it did not breach the Agreement.

### B. Breach of the Implied Covenant of Good Faith and Fair Dealing

Under California law, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 683 (1988).  "The implied covenant protects the reasonable expectations of the contracting parties based on their mutual promises." *Digerati Holdings, LLC v. Young Money Entm't, LLC*, 194 Cal. App. 4th 873, 885 (2011).  "[A] breach of the implied covenant is necessarily a breach of contract." *Id.*  To maintain a claim for breach of the implied covenant, a plaintiff must show that "a contract exists between the parties, that the plaintiff performed his contractual duties or was excused from nonperformance, that the defendant deprived the plaintiff of a benefit conferred by the contract in violation of the parties' expectations at the time of contracting, and that the plaintiff's damages resulted from the defendant's actions." *Singh v. Google Inc.*, 2017 WL 2404986, at *3 (N.D. Cal. June 2, 2017).  For the same reasons discussed above, the Court finds that Plaintiffs failed to perform under the contract.  Google is entitled to summary judgment on the claim for breach of the implied covenant.

### C. Declaratory Relief

Plaintiff's third cause of action seeks a declaratory judgment that the Limitation of Liability provision is unenforceable due to unconscionability.  Am. Compl. ¶¶ 49-54; Ex. 9 at 516.  Google argues that Plaintiffs lack standing to pursue this claim because their other claims fail, so the Limitation of Liability provision has no impact on them.  "Three elements form the irreducible

constitutional minimum of standing to file suit in federal court." *Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 816 (9th Cir. 2017) (analyzing standing for a claim for declaratory relief). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* The Court agrees with Google that Plaintiffs "lack[] standing to seek . . . declaratory relief because they would not stand to benefit from such relief." *Slayman v. FedEx Ground Package Sys., Inc.*, 765 F.3d 1033, 1047-48 (9th Cir. 2014). Google's motion is granted as to Plaintiffs' claim for declaratory relief.

## IV. Conclusion

For the reasons discussed above, the Court grants Google's motion for summary judgment as to each of Plaintiffs' claims and denies Plaintiffs' cross motion for summary.

**IT IS SO ORDERED.**

Dated: May 15, 2019

_____
EDWARD J. DAVILA
United States District Judge

Case No.: 5:16-cv-05822-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT; DENYING CROSS MOTION FOR SUMMARY JUDGMENT